# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ARSHAD AZIM,

          **Plaintiff,**

v.

**TORTOISE CAPITAL ADVISORS, LLC, et al.,**

          **Defendants.**

                **Case No. 13-2267-DDC-JPO**

## MEMORANDUM AND ORDER

Plaintiff brings this action against his former employer, Tortoise Capital Advisors, LLC ("Tortoise"), the parent company of Tortoise, Mariner Holdings, LLC ("Mariner"), and several individuals affiliated with either Tortoise or Mariner,[1] alleging four claims:  (1) national origin discrimination under 42 U.S.C. § 1981; (2) religious discrimination under 42 U.S.C. § 2000e (Title VII); (3) retaliation for reporting securities violations in violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), 15 U.S.C. § 78u–6(h)(1)(A), and (4) interference with plaintiff's civil rights by obstructing justice in violation of 42 U.S.C. § 1985(3).  This matter comes before the Court on defendants' Motion for Summary Judgment (Doc. 121), which seeks dismissal of plaintiff's four claims.  For the reasons explained below, the Court grants defendants' Motion for Summary Judgment.

## I.  Pro Se Litigant's Lack of Compliance with Local Rules

Before turning to the merits of defendants' motion, the Court first addresses plaintiff's failure to comply with the Court's rules governing summary judgment motions.  Plaintiff has

---

[1]    Plaintiff names the following individuals as defendants:  H. Kevin Birzer, who was Senior Managing Director of Tortoise during plaintiff's employment; Michelle Kelly, Director of Business Development and plaintiff's supervisor at Tortoise; Marty Bicknell, the chief executive officer of Mariner; and Tabitha Boissonneau, Human Resources Manager for Mariner.

ignored the requirements that local rules impose on the summary judgment process, even though defendants sent the rules directly to him.  D. Kan. Rule 56.1(f) requires that "[a]ny represented party moving for summary judgment against a party proceeding pro se must serve and file as a separate document . . . [a] 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed. R. Civ. P. 56 and D. Kan. Rule 56.1 attached."  Defendants here sent plaintiff the required notice in accordance with the local rule.  Doc. 125.  This notice advised plaintiff that if he did "not respond to the motion for summary judgment on time with affidavits and/or documents contradicting the material facts asserted by the defendant[s], the court may accept defendant[s'] facts as true, in which event [plaintiff's] case may be dismissed and judgment entered in defendant[s'] favor without a trial."  Doc. 125 at 2.

Plaintiff timely filed a Memorandum in Support of the Response to Defendants' Motion for Summary Judgment (Doc. 135).  But his Response fails to controvert the facts asserted by defendants in their Memorandum in Support of Summary Judgment, as the Court's local rules require.  D. Kan. Rule 56.1(a) provides that "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."  D. Kan. Rule 56.1(a).  To controvert facts in the fashion the rule requires, the nonmoving party must number the facts and "refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed."  D. Kan. Rule 56.1(b)(1).  Plaintiff's Response does not comply with these local rules.  Because plaintiff has not controverted defendants' facts, the Court deems defendants' facts admitted and accepts them as true.

Instead of controverting defendants' facts, plaintiff has asserted 26 additional factual statements that he claims are material facts in which a genuine issue exists that prevent the Court from granting summary judgment.  Defendants have responded to plaintiff's 26 factual statements, many of which plaintiff fails to support with evidence from the record, as the Court's local rule requires.  *See* D. Kan. Rule 56.1(b)(2) ("If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party must set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above.").

Although plaintiff is a pro se litigant and the Court must construe his filings liberally, the Court will not serve as his advocate and will not accept as true conclusory allegations unsupported by evidence in the record.  *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013) (citations omitted).  Plaintiff's pro se status does not excuse him from complying with federal and local rules.  *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) ("This court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants." (citations and internal quotation marks omitted)); *see also Elrod v. Walker*, No. 06-3115-SAC, 2011 WL 6372881, at *6 n.3 (D. Kan. Dec. 20, 2011) ("Although the Court affords some leeway to pro se parties, it cannot merely overlook Plaintiff's failure to state and oppose material facts in compliance with the local rules, and Plaintiff's failure to submit admissible evidence . . . .").  Thus, the Court does not accept plaintiff's factual statements that are not supported by proper evidence.[2]  But, where defendants have stated that certain of plaintiff's

---

[2]     For example, the Court does not accept factual statements made in paragraph 7 of plaintiff's Memorandum in Support of the Response to Defendants' Motion for Summary Judgment (Doc. 135 at 4–5), that plaintiff was "duped" into attending a meeting on April 30, 2012, where he was "wrongfully terminated" and "threaten[ed] and harass[ed]" by Mr. Birzer and Ms. Boissonneau to sign a release agreement.  The Court also does not accept plaintiff's description in paragraph 8 of that Memorandum (Doc. 135 at 5), that the April 30, 2012 meeting was held in a "solitary confinement, prison-cell type

factual statements are uncontroverted, the Court accepts those unconverted facts as true and incorporates those facts (if they are material) into the statement of uncontroverted facts that follows.

## II.    Uncontroverted Facts

The following facts either have been stipulated by the parties in the Pretrial Order (Doc. 118) or are uncontroverted and stated in the light most favorable to plaintiff, the nonmoving party. *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1096 (10th Cir. 1999).

### *Plaintiff's Employment Offer*

Plaintiff began working for Tortoise as a vice president in the business development department on September 12, 2011.  Before his hire, plaintiff interviewed in person with Mr. Birzer, Ms. Kelly, and Terry Matlack, Managing Director of Tortoise.  Mr. Birzer, Ms. Kelly, and Mr. Matlack knew, before they hired him, that plaintiff was of some Asian origin, or more precisely, from somewhere on the Indian subcontinent.  Ms. Kelly made the decision to hire plaintiff after consulting with and receiving input from Mr. Birzer and Mr. Matlack.

On August 22, 2011, Tortoise sent plaintiff a letter with his employment offer.  The letter included information about plaintiff's compensation, paid time off, and the company's policies and benefits.  The letter listed 11 paid holidays that Tortoise provides each calendar year, but noted that "[o]ther faith-based holidays will be recognized in lieu [of the listed holidays] if coordinated with the Managing Directors."  Doc. 122-10 at 2.  The letter did not reference any

---

room."  The Court also does not accept the factual statements made in paragraph 18 of plaintiff's Memorandum (Doc. 135 at 9), that Tortoise's Employee Manual "speaks a language diametrically at odds with plaintiffs' treatment," or those made in paragraph 26 (Doc. 135 at 10–11), that Ms. Boissonneau's Activity Log "is a fabrication to cover up for her employer and those to whom she is beholden, with a myriad of redactions and inconsistencies."  These are examples of conclusory and unsupported statements that the Court refuses to accept as true in deciding this summary judgment motion.  *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (explaining that a non-movant must rely on admissible evidence to avoid summary judgment; conclusory and self-serving statements are not sufficient).

requirements about plaintiff's work hours.  It offered plaintiff a starting salary of $142,500 per

year with eligibility for an annual bonus based upon the financial health of Tortoise and

plaintiff's individual performance.  The letter also stated that plaintiff's employment was

contingent upon his acknowledgment of Tortoise policies, practices, and compliance

requirements.  Plaintiff signed the offer letter on August 23, 2011.

On August 27, 2011, plaintiff signed an employee manual acknowledgment form stating

that he has read or will read the employee manual.  Tortoise's employee manual contains the

following information under the heading "HOURS OF WORK":

> [Tortoise] expects employees to maintain regular business hours of 8:00 a.m. to
> 5:00 p.m., including one hour for lunch.  Accordingly, the normal work week
> consists of 40 hours, five consecutive days, Monday through Friday.  *Hours may*
> *vary for some employees whose job responsibilities may require them to start*
> *work before 8:00 a.m. or work beyond 5:00 p.m.*

Doc. 122-9 at 3 (emphasis added).  Plaintiff testified that his work hours at Tortoise were from

8:00 a.m. to 5:00 p.m.  However, he also recognized that, as a vice president, he was employed

in a professional position at Tortoise and that part of his job description required him to know

how to prioritize and "when to work on weekends, when to work at 2:00 a.m. on Sunday

morning and when the need so calls . . . ."  Doc. 122-7 at 78–79 (Azim Dep. at 215:8–216:10).

### *Plaintiff's Supervision by Ms. Kelly*

Ms. Kelly was plaintiff's supervisor during his employment at Tortoise.  Plaintiff

complains that, during his employment, Ms. Kelly put work above all else and wanted him

available at her beck and call 24 hours a day, seven days a week, without exception.  Plaintiff

claims that Ms. Kelly's demands prevented him from praying on Fridays and affected his

personal life and religious obligations.  Plaintiff alleges that Ms. Kelly also harassed two other

employees—Jeremy Goff and Brian Sulley, who are both Caucasian males.  Mr. Goff told

plaintiff that Ms. Kelly was discriminating against him and harassing him.  Mr. Goff also relayed

stories to plaintiff about Ms. Kelly's harassment of Mr. Sulley.  Plaintiff also alleges that Ms.

Kelly discriminated against and harassed Lisa Rebel, a Caucasian woman.  Plaintiff does not

know if Mr. Sulley or Ms. Rebel is Muslim.  Mr. Goff is not Muslim.

On November 2, 2011, plaintiff sent an email to Ms. Kelly informing her that the

following Sunday was a religious holiday for him, which he described as the equivalent to

Christmas.  He informed Ms. Kelly that he was planning on taking off Monday because he would

be attending a family event out of town over the weekend.  He asked Ms. Kelly to tell him if she

absolutely needed him to attend a board meeting that was scheduled for that same Monday.  Ms.

Kelly responded that plaintiff's plans "[s]ound[ed] good," and she asked plaintiff to "plan on

helping [to] get to the finish line before [he left] for the weekend."  Doc. 122-12 at 2.  Ms. Kelly

advised plaintiff that she was planning to have him make a presentation to the board with two

other employees, but she said that the two employees could handle the presentation this time

because plaintiff was planning to be out of town.  Ms. Kelly also said that she would give

plaintiff a chance to present before the board at a later date.  *Id.*

On December 9, 2011, plaintiff received a memorandum advising him that he would

receive a $10,000 year-end bonus.  The memorandum, authored by Mr. Birzer, stated:  "You are

a valuable member of our team and we sincerely appreciate your hard work and contributions.

On behalf of Tortoise, THANK YOU!"  Doc. 122-13.

### *CalSTRS Proposal*

Mr. Birzer asked plaintiff to attend a conference call on April 2, 2012, with

representatives of The California State Teachers' Retirement System ("CalSTRS").  The call's

purpose was to raise investment assets from CalSTRS.  After the call, Mr. Birzer sent an email to

Tortoise employees, including plaintiff, summarizing the discussion Mr. Birzer and plaintiff had with CalSTRS representatives on April 2, 2012.  In that email, Mr. Birzer stated:  "I told [a CalSTRS representative] we have not done performance-based fees and we have not co-invested, but we would check on this internally and ideally could get her an answer by next week."  Doc. 122-14 at 3.  Plaintiff asserts that this statement is false.  Plaintiff contends that another sentence in the email proves this statement is false because it reads:  "[W]ill we agree to offer her performance-based fees such as we did with Iowa?"  *Id.*  Toward the end of the email, Mr. Birzer asked:  "Arshad, did I miss anything?"  *Id.*  Plaintiff responded to Mr. Birzer's email stating that Mr. Birzer "got all the points and didn't miss anything from the call."  *Id.* at 2.  Plaintiff alleges, however, that he spoke to Mr. Birzer before responding to the email and Mr. Birzer forced him to respond in that manner.

After the April 2, 2012 conference call, plaintiff drafted the proposed CalSTRS term sheet, received comments about the draft from Tortoise employees, worked on materials for presentation to the Tortoise Energy Infrastructure Corporation Board of Directors about the CalSTRS proposal, and presented the proposal to that board on April 12, 2012.  On April 11, 2012, Abel Mojica sent an email to plaintiff and Ms. Kelly at 8:03 p.m.  This message stated that Mr. Mojica did not see the term sheet in the board materials and asked whether the omission was purposeful.  Plaintiff responded at 8:35 p.m., stating that the term sheet should have been included in the board materials but that he would defer to Ms. Kelly's answer to the question.  Ms. Kelly sent an email at 8:42 p.m., stating that she did not understand that the term sheet should have been included in the board materials.  Ms. Kelly asked plaintiff to "copy all and attach it.  Ideally tonight or go in early.  It needs to get out no later than 8."  Doc. 122-15 at 2.  Plaintiff responded at 9:16 p.m. that it was "[d]one."  *Id.*

Plaintiff alleges that Ms. Kelly made mistakes like forgetting the term sheet in the board materials. Plaintiff claims that from 8:42 p.m. to 9:16 p.m. he corrected Ms. Kelly's mistakes and "did her job." Doc. 122-7 at 96 (Azim Dep. at 276:12–17). This "ticked [plaintiff] off" because "[he] had to do the [H]erculean task of [his] job and then on top of that [he] had to correct all her errors and incompetencies and then present as if she never made those and these were oversights . . . [s]he was not suited for the job she had and [plaintiff] had to bear the brunt of that." *Id.* at 96 (Azim Dep. at 276:18–277:5).

Ms. Kelly sent another email to plaintiff at 9:16 p.m., requesting that he call her. According to plaintiff, his phone call to Ms. Kelly was not a pleasant conversation, and he claims that was when he "broke down." *Id.* at 97–98 (Azim Dep. at 277:12–278:4). During this call, plaintiff admits he told Ms. Kelly:

> When I left work, I had no knowledge of what you were going to do or that anything was going to happen where I would have to spend the remainder of the evening correcting your mistakes. First figuring out what your mistakes are and then correcting your mistakes. Not only do I have to figure out where you messed up or what you did wrong or what you didn't do, then I have to correct it and do your job which I've already done at 9:16 p.m.

*Id.* Plaintiff claims that, during this conversation, Ms. Kelly blamed him for the mistake and told him that he should not email someone at Abel Mojica's level about the mistake because it would not amount to anything good.

### *Teneo Opportunity*

On Saturday morning, April 14, 2012, Mr. Birzer contacted plaintiff and Ms. Kelly about a business opportunity with a company called Teneo. He left voicemail messages for both plaintiff and Ms. Kelly, and then he followed up with an email to them at 7:07 a.m. Plaintiff did not take issue with Mr. Birzer contacting him on Saturday morning because it was a tremendous

opportunity.  Also, plaintiff had worked on this project before, starting it from scratch.  At 11:49

a.m., Ms. Kelly sent an email to plaintiff with the subject line "teneo."  Doc. 122-18 at 2.  It read:

> We need to move quickly here and revise a term sheet.  We can distinguish our
> expertise here dramatically from the others given the history of what we have
> already done.  We need to discuss this soon.  Let me know when you can.  I'm at
> work now or [reachable] on my cell.

*Id.*  Plaintiff believed that Ms. Kelly was an impediment to the Teneo project because "the

strategy she was suggesting would make sure that this opportunity would go nowhere and

everything that was done up until that point would come to a knot . . . ."  Doc. 122-7 at 289

(Azim Dep. at 289:17–23).  At 10:32 p.m., Ms. Kelly responded to Mr. Birzer's initial email

about the Teneo project.  She stated, among other things, that she thought they needed to move

fast and that she was working on a list of the company's competitive advantages.

On Sunday, April 15, 2012, at 9:00 p.m., plaintiff responded to Ms. Kelly's April 14,

2012 email in which she stated that they needed to discuss the Teneo project soon.  Plaintiff

offered to discuss the project with her early tomorrow morning.  Ms. Kelly replied to plaintiff's

email at 9:06 p.m., stating that she had hoped to discuss the project earlier in the weekend so that

they could have made progress on it.  She noted that Mr. Birzer had asked them to stay on top of

this project, and she asked plaintiff to stop by in the morning.  Plaintiff responded at 9:17 p.m.,

stating:  "Rest assured, we have been on top of this and will continue to do so, as per Kevin's

suggested time frame.  Let's discuss in the a.m."  Doc. 122-20 at 2.  Ms. Kelly sent another email

to plaintiff at 9:22 p.m., which read:  "Arshad—there is a big history here and one that I haven't

been able to update you on.  As that is the route Kevin[ ] wants to go, we can't really do much,

until we discuss.  Let's catch up in the a[.]m."  *Id.*  Ms. Kelly sent another email to plaintiff at

10:02 p.m., stating:  "Also I think our timeframe should be no more than one week but let's

discuss." *Id.*  At 10:52 p.m., plaintiff forwarded his email chain with Ms. Kelly to Mr. Birzer stating "FYI only." *Id.*

Also, on Sunday, April 15, 2012, plaintiff responded to Mr. Birzer's initial email about the Teneo project that he had sent on Saturday morning.  At 10:48 p.m. on Sunday, plaintiff sent an email to Mr. Birzer in which he thanked him for the voicemails and email and stated that he agreed with all of his comments.  Plaintiff then provided his thoughts about the project in five numbered paragraphs.  In that email, plaintiff proposed a strategy for the project that differed from Ms. Kelly's strategy.  At 10:50 p.m., Ms. Kelly responded to plaintiff's email stating: "Arshad—can we please discuss?  If you are up call my cell . . . ."  Doc. 122-21 at 2.  Plaintiff forwarded this email chain with Ms. Kelly to Mr. Birzer at 10:58 p.m., suggesting that they "talk about this when you have time." *Id.*  And plaintiff responded to Ms. Kelly's email at 10:59 p.m., stating that he was almost asleep and suggested that they talk in the morning.  Ms. Kelly responded at 10:59 p.m., stating that she would plan on meeting plaintiff at 9:00 a.m.

At 10:51 p.m., Ms. Kelly sent an email to Mr. Birzer forwarding plaintiff's email with his strategy for the Teneo project and asking Mr. Birzer to let her handle the matter.  She sent another email to Mr. Birzer at 10:59 that read:

> To clarify I am having a bit of a tough time with [A]rshad.  Glad that he is engaged but he did not handle the past two days appropriately.  I would really prefer to not be undercut and that he is very clear that is not acceptable.  I was with the email he sent to you and I am pretty frustrated about that.  So if possible if you could just note to him that you will be looking to me that would be very helpful.  [H]appy to discuss when you are back or sooner if you prefer.

Doc. 122-24 at 2.

Mr. Birzer emailed Ms. Kelly and plaintiff on Monday, April 16, 2012, at 7:28 a.m.  He thanked them both for the thoughts on Teneo.  He stated that he was "very comfortable" with Ms. Kelly's recommendations for the project.  Doc. 122-25 at 2.  He noted that Ms. Kelly had

"the knowledge and history here" and directed her to "proceed as [she] deem[s] appropriate." *Id.* Mr. Birzer also thanked plaintiff for developing the relationship and pursuing it. He noted that it had the potential to be a tremendous relationship for the company. Two minutes later, at 7:30 a.m., plaintiff sent an email to Ms. Kelly stating: "I am sick and not feeling well. I will not be in today." Doc. 122-26.

### *Plaintiff's Communications with Human Resources*

That same day, plaintiff called Tabitha Boissonneau to complain about his work environment and Ms. Kelly's management practices. Ms. Boissonneau was the Human Resources Manager for Tortoise's parent company, Mariner, and she provided human resources services to Tortoise during plaintiff's employment. During her phone call with plaintiff, he complained about many things, including: feeling completely broken down; having a high level of stress; being available 24/7 for calls and e-mails; being cornered and yelled at by Ms. Kelly; his job description did not describe more than a 40-hour work week; Ms. Kelly's rude, crude, unprofessional, and disrespectful behavior; feeling threatened by Ms. Kelly; being referred to as "hey;" Ms. Kelly putting up her hand during conversation; Ms. Kelly requiring him to complete a quick Friday afternoon document review before a holiday weekend; receiving weekend calls; inconsistent instructions; working after regular office hours; Ms. Kelly's lack of planning, strategy, vision, and management skills; his belief that Ms. Kelly is overworked and that causes her to push work to her subordinates; Jeremy Goff and Brian Sulley feel the same way, but plaintiff gets the brunt of it because he works more closely with Ms. Kelly; the company and the team have no structure; and the company is operated like a "mom and pop shop" with no deadlines or definition of responsibility. But plaintiff made no complaints during this call about securities violations, racial discrimination, or religious discrimination.

On April 17, 2012, plaintiff sent an email to Ms. Boissonneau titled "Harassment Discussion Yesterday." Doc. 122-29 at 2. In that email, plaintiff thanked Ms. Boissonneau for discussing the "harassment issue" with him the day before. *Id.* He stated that the "harassment issue" had been going on for a seven-month period, and "the hostile work condition" had grown progressively worse. *Id.* Plaintiff stated that he was unwell and unable to return to work until concrete steps were taken to address the issue. Plaintiff recommended that "HR convene a meeting" to discuss the "harassment issue" that included plaintiff, his counsel, Mr. Birzer, and Ms. Kelly. *Id.* While plaintiff's email referenced "harassment" and "hostile work condition," plaintiff did not complain explicitly about racial or religious discrimination or harassment or any securities violations.

On April 17, 2012, Ms. Boissonneau sent plaintiff two emails. First, she replied to plaintiff's email titled "Harassment Discussion Yesterday" by thanking him for his follow up and advising him that she would contact the appropriate individuals about seeking a resolution and that she would be in touch. Second, she contacted plaintiff later that day to thank him for his patience while the company attempted to get everyone in place to discuss the matter. She noted that Mr. Birzer was not expecting him at work in the meantime, and she requested that he forward any work-related communications that he may receive in his absence to her attention. She also requested information about plaintiff's legal counsel and provided information about the company's internal head of legal matters so that they could make an introduction.

On April 18, 2012, Ms. Boissonneau called plaintiff and invited him to a meeting on April 20, 2012. That same day, Ms. Boissonneau sent plaintiff an email in which she asked him to formalize his grievances by providing written documentation. On April 20, 2012, plaintiff sent an email to Ms. Boissonneau. It provided:

Encapsulated below is the written documentation of the grievances which we will discuss during the meeting today.

1.  24/7 work hours and the resulting impact on my health, personal life, and religious obligations.

2.  Arbitrary and capricious work load (intra-day, intra-week, intra-month) and the resulting impact on my health, personal life, and religious obligations.

3.  Rampant incompetence and mistakes; and the impact on the Business Development team at TCA, TCA, and the broader organization.

4.  Saboteur and toxic management practices to undermine my competence and growth at the firm; and the impact on the Business Development team at TCA, TCA, and the broader organization.

Doc. 122-32 at 2.

Plaintiff engaged an attorney, Ted Beckett, to attend the April 20, 2012 meeting with him.  Plaintiff claims that he hired an attorney only to discuss religious discrimination.  He did not report any securities violations to his lawyer.

On April 20, 2012, plaintiff and Mr. Beckett met with Ms. Boissonneau and Kirk Lambright, in-house counsel for Mariner.  Mr. Beckett understood that plaintiff's only complaints consisted of those referenced in plaintiff's April 20, 2012 email to Ms. Boissonneau. No other complaints were discussed during the April 20, 2012 meeting.  Mr. Beckett recalls that, during the meeting, they discussed each of the four points from plaintiff's April 20, 2012 email to Ms. Boissonneau.  Mr. Beckett does not recall any discussion of alleged securities violations or alleged harassment or discrimination based on race or national origin at the April 20, 2012 meeting.

According to Ms. Boissonneau, plaintiff complained about Ms. Kelly during the April 20, 2012 meeting.  He stated that Ms. Kelly was incompetent and had no experience for her position. He claimed that she was unable to write e-mails that use correct grammatical language and form

complete sentences.  He stated that Tortoise should not employ a person in a management position who is incompetent and unprofessional.  Throughout the meeting, plaintiff reiterated that Ms. Kelly was incompetent and not deserving of her position, and he claimed that the company, as a whole, made business decisions that he did not agree with or support.  He noted that not a single person at Tortoise has managed the amount of money that he has—$18 billion— and that no one can claim the experience and success that he has had.

Also, plaintiff complained during the April 20, 2012 meeting about a time in March 2012 when he was on board an airplane and receiving calls and emails from Ms. Kelly.  He reported that the flight attendants told him many times to turn off his phone, but Ms. Kelly would not let him.  He tried to explain to Ms. Kelly that he had to go and he would call her after he landed, but she would not listen and said that she did not care.  He told Ms. Kelly that he could not disobey the flight crew and that Ms. Kelly was forcing him to stay on the phone.  He then said, "Look at me, I can't tell them no."  As he said this, he put his arms toward himself.  According to Ms. Boissonneau, plaintiff seemed to express that his appearance made the situation more severe. Also according to Ms. Boissonneau, plaintiff made no complaint to her that Ms. Kelly had commented that plaintiff's race subjected him to more scrutiny on the airplane.[3]

Later in his deposition, however, plaintiff gave two different accounts of this incident. Plaintiff initially testified that Ms. Kelly commented that plaintiff drew more scrutiny while boarding the plane because of his "Middle Eastern name" or his race.  Doc. 122-7 at 39–41 (Azim Dep. 101:22–103:3).  But, after he was reminded of his oath, plaintiff admitted that he may have been the person to raise the issue about his race, not Ms. Kelly.  *Id.* at 43 (Azim Dep. 106:1–8).  Plaintiff's admission that he may have been the first one to raise the race issue is

---

[3]       This description of the incident is consistent with Ms. Boissonneau's contemporaneous notes of the April 20, 2012 meeting.

consistent with the description in Ms. Boissonneau's notes.  Construing the evidence in the light most favorable to plaintiff, the Court assumes that Ms. Kelly may have commented about plaintiff's race but she did so after plaintiff raised the issue first.

Plaintiff also stated during the April 20, 2012 meeting that he wanted to return to his position at Tortoise but that he wanted to report directly to Mr. Birzer instead of Ms. Kelly. Later, plaintiff stated that he wanted to report to Ken Malvey.  Plaintiff also said that he wanted to work from 8:30 a.m. to 5:00 p.m.

After the April 20, 2012 meeting, Mr. Beckett drafted two letters, at plaintiff's request, summarizing the discussion at the meeting.  Neither of the two letters describes any complaints of securities violations or race discrimination.

### Plaintiff's Termination

After the April 20, 2012 meeting, Mr. Birzer and Mr. Matlack learned that plaintiff was willing to come back to work under certain conditions.[4]  They also learned about the substance of plaintiff's complaints.  Mr. Birzer and Mr. Matlack did not feel that plaintiff's demands were reasonable.  Also, plaintiff's criticisms of Tortoise and its management offended them.  Mr. Birzer and Mr. Matlack believed they could not continue to employ someone who felt that way about the company and made such demands on its management.  Therefore, Mr. Birzer, in close consultation with Mr. Matlack and after conferring with Ms. Kelly, decided to reject plaintiff's conditions for returning to work and, instead, terminate his employment.

On April 24, 2012, Mr. Lambright called plaintiff's attorney and advised him that:

---

[4]      Plaintiff asserts that he did not place any demands or conditions on his return to work other than the resolution of his complaint, but the evidence he cites does not support this assertion.  *See* Doc. 135 at 21.  Plaintiff relies on the deposition of Ted Beckett, his attorney, to support this factual assertion.  But Mr. Beckett testified that he *did not recall* if plaintiff had placed conditions upon which he would return to work.  Doc. 132-18 at 19 (Beckett Dep. at 17:22–25).  Importantly, he did not testify that plaintiff placed no conditions on his return to work.

(1) Tortoise had conducted an internal investigation into the issues plaintiff raised at the April 20, 2012 meeting; (2) the investigation did not support plaintiff's allegations of religious discrimination; (3) plaintiff holds a position at Tortoise that is above entry-level and there was no room to move him laterally to a new position or to a more senior position; (4) plaintiff's employment did not fit with Tortoise, and Tortoise would not allow him to return to work and continue his employment; (5) plaintiff had performance issues with his work for Tortoise; and (6) Tortoise would consider a severance payment to plaintiff.

On April 30, 2012, Mr. Birzer and Ms. Boissonneau met with plaintiff. During that meeting, Mr. Birzer informed plaintiff that Tortoise was terminating his employment, effective May 1, 2012. Tortoise offered plaintiff a severance package that included financial compensation in exchange for a release of claims. After the meeting, Tortoise emailed plaintiff a draft release agreement. Plaintiff refused to sign that agreement and demanded additional severance compensation. Tortoise rejected his demand. Plaintiff never signed a post-employment agreement with Tortoise, and he never released any claims against Tortoise or its agents.

### Plaintiff's EEOC Charge of Discrimination

On May 3, 2012, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging (1) discrimination based on race, national origin, and religion, and (2) retaliation. Plaintiff completed an EEOC Intake Questionnaire on May 3, 2012. Plaintiff testified that he gave his best truthful answers to the questions on the Intake Questionnaire and that he would not lie to the EEOC. Plaintiff identified his national origin on the Intake Questionnaire as Indian. In response to a question on the Intake Questionnaire asking plaintiff to identify persons in the same or similar situation as him and who were treated the

same as him, plaintiff listed Jeremy Goff and Brian Sulley.  Plaintiff identified Mr. Goff and Mr. Sulley as "white" on the Intake Questionnaire.

On May 3, 2012, an EEOC investigator interviewed plaintiff about his EEOC claim.  In the investigator's memorandum memorializing the interview, the investigator noted that plaintiff said there were no explicit comments made about his race, national origin, or religion.  The investigator also wrote that plaintiff complained about harassment from Ms. Kelly, including that she engaged in demanding and demeaning behavior, yelled at plaintiff, and expected him to work after hours and on weekends.  On February 29, 2013, the investigator conducted a second interview of plaintiff.  In a memorandum memorializing that interview, the investigator noted that Ms. Kelly made no racial, national origin, or religious comments and that plaintiff had no documents or witnesses to support the prayer issue.

Plaintiff did not report any securities violations to the EEOC.  He also never reported any securities violations to the Securities and Exchange Commission ("SEC").

### The Lawsuit

On June 4, 2013, plaintiff filed this lawsuit.  In his original complaint, plaintiff asserted a Title VII claim (Doc. 1).  On July 25, 2013, plaintiff filed an Amended Complaint which alleged a Title VII claim against Tortoise and a § 1981 claim against Mr. Birzer and Ms. Kelly (Doc. 20).  After obtaining leave from the Court, plaintiff filed a Second Amended Complaint on March 7, 2014, that asserts four claims:  (1) violation of § 1981 against Mr. Birzer, Ms. Kelly, and Ms. Boissonneau, (2) violation of Title VII against Tortoise and Mariner, (3) violation of the Dodd-Frank Act against all defendants, and (4) interference with plaintiff's civil rights by obstructing justice in violation of 42 U.S.C. § 1985(3) against Mr. Birzer, Ms. Kelly, and Ms. Boissonneau.

On April 20, 2015, the Court entered a Pretrial Order (Doc. 118) which "supersedes all pleadings and controls the subsequent course of this case." *Id.* at 1.  The Pretrial Order lists plaintiff's four causes of action:

Count I
Defendants terminated plaintiff's employment in violation of Section 1981 by discriminating against him based on racial background/ethnicity.
Count II
Defendants terminated plaintiff's employment in violation of Title VII, specifically, by discriminating against him based on religion.
Count III
Defendants terminated plaintiff's employment in violation of Dodd-Frank, specifically, by retaliating against him with abject disregard to the whistleblower protection the Act affords.
Count IV
Defendants interfered with plaintiff's civil rights by obstructing justice in violation of Section 1985(3).

Doc. 118 at 14–15.

## III.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## IV.    Analysis

Defendants move for summary judgment against each one of plaintiff's four claims.  The Court first addresses plaintiff's claim that defendants violated the Dodd-Frank Act by retaliating against him for reporting securities violations.  The Court next analyzes plaintiff's Title VII and

§ 1981 claims together.  Finally, the Court discusses plaintiff's obstruction of justice claim under

42 U.S.C. § 1985(3).

### A.  Dodd-Frank Act Claim

In 2010, the Dodd-Frank Act amended the Securities Exchange Act of 1934, adding

incentives and protections for whistleblowers.  15 U.S.C. § 78u–6.  The anti-retaliation provision

of the Dodd-Frank Act provides:

> No employer may discharge, demote, suspend, threaten, harass, directly or
> indirectly, or in any other manner discriminate against, a whistleblower in the
> terms and conditions of employment because of any lawful act done by the
> whistleblower—
>
> (i)      in providing information to the Commission in accordance with this
>          section;
>
> (ii)     in initiating, testifying in, or assisting in any investigation or judicial or
>          administrative action of the Commission based upon or related to such
>          information; or
>
> (iii)    in making disclosures that are required or protected under the Sarbanes-
>          Oxley Act of 2002 (15 U.S.C. 7201 *et seq.*), this chapter, including section
>          78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule,
>          or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u–6(h)(1)(A).

Subsections (i) and (ii) "protect whistleblowers who report potentially illegal activity to

the SEC or who work with the SEC directly, in some manner, concerning potential securities

violations."  *Nollner v. S. Baptist Convention, Inc.*, 852 F. Supp. 2d 986, 993 (M.D. Tenn. 2012).

Here, plaintiff admits that he never reported any alleged securities violations to the SEC.  Thus,

he seeks relief under subsection (iii), which requires plaintiff to show that:  "(1) he reported an

alleged violation to the SEC or another entity, or internally to management; (2) he was retaliated

against for reporting the alleged violation; (3) the disclosure of the alleged violation was made

pursuant to a rule, law, or regulation subject to the SEC's jurisdiction; and, (4) the disclosure was

required or protected by that rule, law, or regulation within the SEC's jurisdiction." *Genberg v. Porter*, 935 F. Supp. 2d 1094, 1105 (D. Colo. 2013) (citing *Nollner*, 852 F. Supp. 2d at 995).

Defendants move for summary judgment against this claim because, they contend, plaintiff fails to raise a genuine issue of material fact about any of the four elements of a retaliation claim under the Dodd-Frank Act. The Court addresses each element in turn below.

### 1. The uncontroverted evidence establishes that plaintiff made no report of an alleged securities violation.

Defendants make two arguments about plaintiff's failure to report a securities violation. First, defendants assert that plaintiff's Dodd-Frank Act claim fails because plaintiff did not report a securities violation to the SEC, which, defendants contend, the Act requires. Second, defendants contend that, even if the Act does not require plaintiff to report a securities violation to the SEC, no admissible evidence would permit a rationale jury to find that plaintiff made an internal report of such a violation to establish the first element of a retaliation claim.

### a. Is plaintiff required to report to the SEC?

Turning to defendants' first argument, defendants assert that plaintiff is not a "whistleblower" as defined by the Act because he did not report securities violations to the SEC. The Dodd-Frank Act's anti-retaliation provision applies only to "whistleblowers"—the introductory paragraph prohibits an employer from taking retaliatory acts against "a *whistleblower* in the terms and conditions of employment because of any lawful act done by the *whistleblower* . . . ." 15 U.S.C. § 78u–6(h)(1)(A) (emphasis added); *see also Bussing v. COR Clearing, LLC*, 20 F. Supp. 3d 719, 728 (D. Neb. 2014) ("By its terms, the anti-retaliation provision of Dodd-Frank only extends protection to 'whistleblowers.'"). The Dodd–Frank Act defines a "whistleblower" as "any individual who provides . . . information relating to a violation of the securities laws to the Commission, in a manner established, by rule or regulation, by the

Commission."  15 U.S.C. § 78u–6(a)(6).  Defendants argue that plaintiff is not a "whistleblower" under this definition because he never reported any securities violations to the SEC, as the plain language of the statute requires.

But several courts have acknowledged that the Dodd-Frank Act's definition of "whistleblower" "exists in tension with subsection (iii) of the anti-retaliation provision, which protects a broad range of disclosures to entities other than the SEC."  *See Bussing*, 20 F. Supp. 3d at 729; *see also Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 147 (2d Cir. 2015) (noting the "arguable tension" between the definition of whistleblower in the Dodd-Frank Act and subsection (iii) of the anti-retaliation provision); *Murray v. UBS Sec., LLC*, No. 12 Civ. 5914(JMF), 2013 WL 2190084, at *4 (S.D.N.Y. May 21, 2013) (concluding that an "ambiguity [in the Act] arises from the tension between . . . the definition of 'whistleblower' [which is limited] to one who made a disclosure to the SEC, and [subsection (iii) of the anti-retaliation provision] which contemplates a broader scope of protection.").

Also, in 2011, the SEC promulgated a final rule clarifying the Dodd–Frank Act's whistleblower provision.  *See* 17 C.F.R. § 240.21F–2(b)(1).  It states:

(1) For purposes of the anti-retaliation protections afforded by [15 U.S.C. § 78u– 6(h)(1)], you are a whistleblower if:

(i)   You possess a reasonable belief that the information you are providing relates to a possible securities law violation (or, where applicable, to a possible violation of the provisions set forth in 18 U.S.C. 1514A(a)) that has occurred, is ongoing, or is about to occur, and;

(ii)   You provide that information in a manner described in [15 U.S.C. § 78u– 6(h)(1)(A)].

(iii)   The anti-retaliation protections apply whether or not you satisfy the requirements, procedures and conditions to qualify for an award.

*Id.* In its comments to the final rule, the SEC stated that "the third category [under § 78u–6(h) (1)(A)(iii)] includes individuals who report to persons or governmental authorities other than the Commission." SEC, Securities Whistleblower Incentives and Protections, 76 Fed. Reg. 34300–01, 34304 (June 13, 2011) (codified at 17 C.F.R. pts. 240–49).[5]

The perceived conflict in the statutory language has produced a Circuit split over the scope of the Dodd-Frank Act's anti-retaliation provision. The Fifth Circuit addressed this issue first. In *Asadi v. G.E. Energy (USA), LLC*, the Fifth Circuit concluded "[b]ased on [its] examination of the plain language and structure of the whistleblower-protection provision . . . that the whistleblower-protection provision unambiguously requires individuals to provide information relating to a violation of the securities laws to the SEC to qualify for protection from retaliation under [the Dodd-Frank Act]." 720 F.3d 620, 629 (5th Cir. 2013). At least seven district courts have followed the Fifth Circuit's decision in *Asadi*, holding that the plain language of the statute controls the definition of "whistleblower" and includes only those individuals who make a report to the SEC. *See Davies v. Broadcom Corp.*, __ F. Supp. 3d __, 2015 WL 5545513, at *4 (C.D. Cal. Sept. 8, 2015); *Wiggins v. ING U.S., Inc.*, No. 3:14–CV–1089 (JCH), 2015 WL 3771646, at *10–11 (D. Conn. June 17, 2015); *Lutzeier v. Citigroup, Inc.*, 305 F.R.D. 107, 110 (E.D. Mo. 2015); *Verfuerth v. Orion Energy Sys., Inc.*, 65 F. Supp. 3d 640, 643–46 (E.D. Wis. 2014); *Englehart v. Career Educ. Corp.*, No. 8:14–cv–444–T–33EAJ, 2014 WL 2619501, at *8–9 (M.D. Fla. May 12, 2014); *Banko v. Apple Inc.*, 20 F. Supp. 3d 749, 755–57 (N.D. Cal. 2013); *Wagner v. Bank of Am. Corp.*, No. 12–cv–00381-RBJ, 2013 WL 3786643, at *4–6 (D. Colo. July 19, 2013). This conclusion, however, is the minority view.

---

[5]     The SEC has filed an Amicus Brief (Doc. 138) in this case, and made three other filings submitting supplemental authority (Docs. 139, 140, 142). The Court has reviewed each of the SEC's filings and considered its arguments and authorities.

But recently, the Second Circuit reached the opposite conclusion.  It held that the statutory language is ambiguous and therefore requires deference to the SEC's rule defining a broader scope of whistleblower protection to individuals who report to persons or governmental authorities other than the Commission.  *See Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 155 (2d Cir. 2015).  Many district courts have decided the question the same way.  *See Dressler v. Lime Energy*, No. 3:14–cv–07060 (FLW)(DEA), 2015 WL 4773326, at *14–16 (D.N.J. Aug. 13, 2015); *Somers v. Digital Realty Trust, Inc.*, No. C14–5180 EMC, 2015 WL 4483955, at *4–12 (N.D. Cal. July 22, 2015); *Yang v. Navigators Group, Inc.*, 18 F. Supp. 3d 519, 533–34 (S.D.N.Y. 2014); *Ahmad v. Morgan Stanley & Co.*, 2 F. Supp. 3d 491, 496 n.5 (S.D.N.Y 2014); *Connolly v. Remkes*, No. 5:14–CV–01344–LHK, 2014 WL 5473144, at *6 (N.D. Cal. Oct. 28, 2014); *Khazin v. TD Ameritrade Holding Corp.*, No. 13–4149 (SDW)(MCA), 2014 WL 940703, at *3–6 (D.N.J. Mar. 11, 2014); *Rosenblum v. Thomson Reuters (Mkts.) LLC*, 984 F. Supp. 2d 141, 146–48 (S.D.N.Y. 2013); *Ellington v. Giacoumakis*, 977 F. Supp. 2d 42, 45 (D. Mass. 2013); *Murray v. UBS Sec., LLC*, No. 12–5914, 2013 WL 2190084, at *4 (S.D.N.Y. May 21, 2013); *Genberg v. Porter*, 935 F. Supp. 2d 1094, 1106–07 (D. Colo. 2013); *Nollner v. S. Baptist Convention, Inc.*, 852 F. Supp. 2d 986, 995 (M.D. Tenn. 2012); *Kramer v. Trans–Lux Corp.*, No. 3:11cv1424 (SRU), 2012 WL 4444820, at *4 (D. Conn. Sept. 25, 2012); *Egan v. TradingScreen, Inc.*, No. 10 Civ. 8202 (LBS), 2011 WL 1672066, at *6–7 (S.D.N.Y. May 4, 2011).

This issue is one of first impression in the District of Kansas.[6]  The Tenth Circuit has not addressed this issue, but two district courts within our Circuit have decided the issue with

---

[6]      In *Berman*, the Second Circuit cited an opinion issued by Judge O'Hara in this case to support the following statement:  "[a] far larger number of district courts have deemed the statute ambiguous and deferred to the SEC's Rule."  801 F.3d at 153 (citing *Azim v. Tortoise Capital Advisors, LLC*, No. 13–2267–KHV, 2014 WL 707235, at *2–3 (D. Kan. Feb. 24, 2014) (further citations omitted)).  But this Court does not read Judge O'Hara's opinion as one reaching a definitive conclusion on this issue.

conflicting results.  *Compare Wagner v. Bank of Am. Corp.*, No. 12–cv–00381-RBJ, 2013 WL 3786643, at *4–7 (D. Colo. July 19, 2013) (holding that the plain language of the statute requires a plaintiff asserting a Dodd-Frank Act retaliation claim to show that she is a "whistleblower" who made a complaint to the SEC) *with Genberg v. Porter*, 935 F. Supp. 2d 1094, 1106–07 (D. Colo. 2013) (agreeing with other district courts' interpretation of subsection (iii) as an exception to the whistleblower definition in the Dodd-Frank Act and holding that the anti-retaliation provision does not require plaintiff to make a report to the SEC).

This is an intriguing question.  But, in the end, the Court does not need to decide it to resolve the issue presented by defendants' motion.  The Court thus declines to decide the issue.

### b.  Did plaintiff make an internal report of securities violations?

Defendants next argue that, even if the Dodd-Frank Act does not require plaintiff to make a report to the SEC, plaintiff's Dodd-Frank Act claim fails because the undisputed facts establish that he never made an internal report of securities violations.  The Court agrees with defendants.

Plaintiff certainly alleges that he reported securities violations to the company's human resources department.  *See* Doc. 118 at 10 (Pretrial Order at ¶ 3a).  His allegations in the Pretrial Order contend that he first made a complaint on April 16, 2012, by phone and in writing as

---

In his opinion, Judge O'Hara granted plaintiff leave to amend his Complaint to add the Dodd-Frank Act retaliation claim.  In opposing the amendment, defendants made the same argument they make now on summary judgment—that plaintiff cannot assert a Dodd-Frank Act claim because he is not a "whistleblower" who reported violations to the SEC as the statute requires.  *Azim*, 2014 WL 707235, at *3.  Defendants urged Judge O'Hara to follow the Fifth Circuit's decision in *Asadi* and deny plaintiff leave to amend, but plaintiff pointed to contrary authority in *Genberg v. Porter*, 935 F. Supp. 2d 1094, 1106–07 (D. Colo. 2013), where the court held that a plaintiff need not make a report to the SEC in order to assert a Dodd-Frank Act retaliation claim as long as he makes disclosures protected under the anti-retaliation provisions in subsection (iii).  *Azim*, 2014 WL 707235, at *3.  Because plaintiff had provided "some authority" from the District of Colorado to support his claim, Judge O'Hara refused to conclude that his proposed amendment was futile.  *Id.*  Judge O'Hara did not rule, however, that the statute is ambiguous or that the Court should defer to the SEC's Rule.  Judge O'Hara also drew no conclusion that plaintiff is entitled to whistleblower protection under the statute based on his allegation that he made internal complaints of securities violations.  Instead, he determined that plaintiff had made sufficient allegations and had cited appropriate legal authority to meet the requirements for obtaining leave to amend his Complaint to assert a retaliation claim under the Dodd-Frank Act.  *Id.*

directed by Ms. Boissonneau.  *Id.*  But plaintiff fails properly to support this assertion with admissible evidence.  Defendants have established, by properly citing record evidence, that plaintiff called Ms. Boissonneau on April 16, 2012, to complain about his work environment and Ms. Kelly's management practices but made no complaints during this call about securities violations.  During the phone call, plaintiff criticized Ms. Kelly's management practices and complained about several things, including a high level of stress, rude and unprofessional behavior by Ms. Kelly, and unreasonable and unpredictable work hours.  But no admissible evidence establishes a basis for the Court to assume at summary judgment that plaintiff mentioned alleged securities violations to Ms. Boissonneau.

Defendants, as the party seeking summary judgment, have complied with their "initial responsibility" under the summary judgment procedure by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" to support these facts showing what plaintiff reported to Ms. Boissonneau on April 16, 2012.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  Upon satisfying that burden, plaintiff, as the non-moving party opposing summary judgment, "'may not rest on the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) (quoting Fed. R. Civ. P. 56).  Plaintiff fails to meet that burden here.  While he alleges that he complained of securities violations to Ms. Boissonneau during the phone call on April 16, 2012, he does not support that allegation with admissible evidence.  Instead, plaintiff relies only on his allegations.  This is improper at summary judgment.  Reviewing the properly cited record evidence in the light most favorable to plaintiff, he reported no securities violations to Ms. Boissonneau during the April 16, 2012 phone call.

Then, on April 17, 2012, plaintiff sent an email to Ms. Boissonneau titled "Harassment

Discussion Yesterday."  In that email, plaintiff referred to a "harassment issue" and "the hostile

work condition" but did not refer to securities violations.  Plaintiff also sent another email to Ms.

Boissonneau on April 20, 2012.  It read:

> Encapsulated below is the written documentation of the grievances which we will
> discuss during the meeting today.
>
> 1. 24/7 work hours and the resulting impact on my health, personal life, and
> religious obligations.
>
> 2. Arbitrary and capricious work load (intra-day, intra-week, intra-month) and the
> resulting impact on my health, personal life, and religious obligations.
>
> 3. Rampant incompetence and mistakes; and the impact on the Business
> Development team at TCA, TCA, and the broader organization.
>
> 4. Saboteur and toxic management practices to undermine my competence and
> growth at the firm; and the impact on the Business Development team at TCA,
> TCA, and the broader organization.

Doc. 122-32 at 2.  During his deposition, plaintiff claimed that points 3 and 4 in his email

referenced complaints of securities violations.  They do not.  Plaintiff's complaints in points 3

and 4 refer only to incompetence, mistakes, saboteur, and toxic management practices—

complaints that comport with those he made about Ms. Kelly's management style during his

telephone conversation with Ms. Boissonneau.  Plaintiff's email communicates his April 20

complaint, and no reasonable factfinder could view the words in that written complaint to

complain about a securities violation.

Nothing in our summary judgment rules permits a plaintiff to recast his words to say

something that they simply do not say.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S 871, 888

(1990) (explaining that while a court must resolve factual differences in favor of the non-moving

party on summary judgment, that rule applies "only . . . where the facts specifically averred by

that party contradict facts specifically averred by the movant . . . .  That is a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint.").

Plaintiff also provides no summary judgment evidence to support his allegation that he raised complaints of a securities violation during the April 20, 2012 meeting with Ms. Boissonneau and Kirk Lambright, in-house counsel for Mariner.  Defendants have established as a summary judgment fact, complete with specific citations to the record, that the parties at the April 20, 2012 meeting discussed the four points in plaintiff's email to Ms. Boissonneau and that no other complaints were raised.  Ted Beckett, the lawyer who plaintiff engaged to represent him during the April 20, 2012 meeting, testified that the parties to the meeting did not discuss any complaints other than the four points contained in plaintiff's email to Ms. Boissonneau.  Mr. Beckett also testified that he did not recall any discussion of alleged securities violations during the meeting.  Also, plaintiff testified in his deposition that he never told Mr. Beckett about alleged securities violations.[7]  After the April 20, 2012 meeting, Mr. Beckett drafted two letters at plaintiff's request.  These two letters summarized the discussion at the April 20, 2012 meeting, and neither of the letters describes any complaints about securities violations.  Plaintiff has failed to come forward with admissible evidence to controvert the summary judgment facts establishing that plaintiff made no complaints of a securities violation at the April 20, 2012 meeting, as he must do as the non-movant on summary judgment.

Plaintiff also claimed in his deposition that Mr. Birzer sent false information in an email to Tortoise employees about a discussion he had with representative of CalSTRS.  In that email, Mr. Birzer stated:  "I told [a CalSTRS representative] we have not done performance-based fees and we have not co-invested, but we would check on this internally and ideally could get her an

---

[7]        Plaintiff did not assert his attorney-client privilege on the subject.

answer by next week." Doc. 122-14 at 3.  Plaintiff claims that this sentence is false because

another sentence in the email states: "[W]ill we agree to offer her performance-based fees such

as we did with Iowa?" *Id.*  These two sentences do not conflict with one another.  The first states

that the company has never done performance-based fees.  The second states that the company

offered performance-based fees but provides no information whether that offer was accepted, or

whether the company ever implemented performance-based fees.  In any event, there is no

evidence that plaintiff complained that this allegedly false information amounted to a securities

violation.  Indeed, the summary judgment evidence shows the opposite.

Near the end of the email, Mr. Birzer specifically asked plaintiff if he had missed

anything in his summary of the conference call, and plaintiff responded that Mr. Birzer "got all

the points and didn't miss anything from the call." *Id.* at 2.  Plaintiff claims now that he spoke to

Mr. Birzer before responding to the email and Mr. Birzer forced him to respond as he did.  But

even after this email exchange, plaintiff completed several tasks for the CalSTRS proposal

without complaining about alleged securities violations.  The undisputed evidence reveals that

plaintiff drafted the proposed CalSTRS term sheet, received comments about the draft from

Tortoise employees, worked on materials for presentation to the Tortoise Energy Infrastructure

Corporation Board of Directors about the CalSTRS proposal, and presented the proposal to that

board on April 12, 2012.  Plaintiff made no complaints during any of this work about securities-

based wrongdoing that might qualify him as a whistleblower.

In sum, the evidence in the record, even when viewed in the light most favorable to

plaintiff, fails to show that plaintiff made any complaints of securities violations before his

termination.  Plaintiff therefore cannot establish this element of a Dodd-Frank Act retaliation

claim because he did not make any internal complaints of alleged securities violations.

### 2. The uncontroverted evidence shows no retaliation.

Summary judgment is warranted for a second, independent reason. Plaintiff has failed his responsibility to come forward with admissible evidence from which a rational jury could find that Tortoise terminated his employment as retaliation for plaintiff's reporting a securities violation. The Dodd-Frank Act prohibits employers from discharging "a whistleblower . . . *because of* any lawful act done by the whistleblower . . . in making disclosures that are required or protected . . . ." 15 U.S.C. § 78u–6(h)(1)(A)(iii) (emphasis added). Plaintiff thus must show some evidence of causation for his claim to survive summary judgment.

The record here, however, provides none. Instead, all the summary judgment facts establish that Tortoise terminated plaintiff's employment because he made critical and disparaging remarks about the company and its management and placed unreasonable demands on management before he would agree to return to work.

On April 16, 2012, plaintiff made complaints to Ms. Boissonneau about his work environment and Ms. Kelly's management practices. During a phone call, he complained about several things including that Ms. Kelly lacked planning, strategy, vision, and management skills. He also accused the company and "his team" of having no structure, and he said that the company is operated like a "mom and pop shop" with no deadlines or definition of responsibility. Then, when plaintiff met with Ms. Boissonneau and Mr. Lambright on April 20, 2012, plaintiff called Ms. Kelly incompetent and claimed she had no experience for her position. He criticized Tortoise for employing someone like Ms. Kelly in a management position because he claimed she is incompetent and unprofessional. Plaintiff also said that the company, as a whole, made business decisions that he did not agree with or support. And plaintiff claimed that not a single person at Tortoise had managed the amount of money that he has—$18 billion—and

that no one can claim the experience and success that he has enjoyed.  Plaintiff also stated during the April 20, 2012 meeting that he wanted to return to his position at Tortoise but he wanted to report directly to Mr. Birzer, and not Ms. Kelly.  He later said that he wanted to report to Ken Malvey.  Plaintiff also stated that he wanted to work from 8:30 a.m. to 5:00 p.m.

After the April 20, 2012 meeting, Mr. Birzer and Mr. Matlack learned that plaintiff was willing to come back to work but under certain conditions he was demanding, *i.e.*, that he report to a different supervisor and only work certain hours.  They viewed plaintiff's demands as unreasonable.[8]  Mr. Birzer and Mr. Matlack also learned that plaintiff had complained about the company's operations and accused Ms. Kelly of being incompetent and unexperienced.  Plaintiff's harsh criticisms of Tortoise and its management offended them.  Upon learning that plaintiff had expressed such criticisms and conditioned his willingness to return to work on Tortoise meeting his demands, Mr. Birzer and Mr. Matlack concluded that they could not continue to employ someone holding these views about the company and making these demands of its management.  Therefore, Tortoise rejected plaintiff's conditions for returning to work and terminated his employment.

The summary judgment evidence, even when viewed in the light most favorable to plaintiff, establishes that Tortoise terminated plaintiff's employment because it decided that it could not employ someone who had expressed harsh and disparaging remarks about the

---

[8]     The Court notes that plaintiff's demand to work only from 8:30 a.m. to 5:00 p.m. conflicts with Tortoise's employee manual which states that the company expects its employees to maintain regular business hours from 8:00 a.m. to 5:00 p.m., with one hour for lunch.  It also notes that hours may vary for some employees whose job responsibilities require them to work before and after the stated business hours.  Plaintiff signed an acknowledgment stating that he has read or will read the employee manual, which includes this information about the company's hours of work.  Plaintiff's demand to work certain hours also conflicts with his understanding of his job responsibilities.  Plaintiff testified in his deposition that he recognized that, as a vice president at Tortoise, he was employed in a professional position earning $142,500 per year and that part of his job description required him to know when he was required to work after hours or "when the need so calls."

company and placed unreasonable demands on its management.  The record lacks any evidence demonstrating that Tortoise terminated plaintiff's employment in retaliation for reporting alleged securities violations.  Thus, plaintiff cannot satisfy this element of a Dodd-Frank Act retaliation claim.

### 3. Plaintiff fails to show that disclosure of an alleged violation was made pursuant to a rule, law, or regulation subject to the SEC's jurisdiction or that disclosure was required or protected by that rule, law, or regulation within the SEC's jurisdiction.

Finally, even if plaintiff could satisfy the first two elements of a Dodd-Frank Act retaliation claim—which, as explained above, he has not—plaintiff's claim fails because he has not proved the third or fourth elements of this claim.  That is, "(3) the disclosure of the alleged violation was made pursuant to a rule, law, or regulation subject to the SEC's jurisdiction; and, (4) the disclosure was required or protected by that rule, law, or regulation within the SEC's jurisdiction." *Genberg*, 935 F. Supp. 2d at 1105 (citing *Nollner*, 852 F. Supp. 2d at 995).  While plaintiff asserts that he complained about securities violations to human resources, he has failed to identify a rule, law, or regulation within the SEC's jurisdiction under which his alleged complaints were made, required, or protected.  Thus, plaintiff's claim fails as a matter of law, and defendants are entitled to summary judgment against plaintiff's Dodd-Frank Act claim.

### B.  Title VII and § 1981 Claims

Plaintiff asserts a Title VII claim against Tortoise and Mariner, alleging that they discriminated against him based on his religion by terminating his employment.  He also makes a claim under 42 U.S.C. § 1981 against Mr. Birzer, Ms. Kelly, and Ms. Boissonneau, alleging that they discriminated against him based on his racial background/ethnicity by terminating his employment.

Title VII prohibits employers from discharging or otherwise discriminating against an individual based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Section 1981 prohibits discrimination based on race. 42 U.S.C. § 1981; *see also Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975) (explaining that § 1981 "affords a federal remedy against discrimination in private employment on the basis of race").

Where, as here, plaintiff lacks direct evidence of discrimination, the Court analyzes both plaintiff's Title VII and § 1981 claims using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) (explaining that the elements of *McDonnell Douglas* apply to discrimination suits whether they are brought under Title VII or § 1981 (citations omitted)); *see also Conroy v. Vilsack*, 707 F.3d 1163, 1171 (10th Cir. 2013) (analyzing Title VII claim under *McDonnell Douglas* because plaintiff provided no direct evidence of discrimination (citations omitted)); *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004) (applying the *McDonnell Douglas* framework to § 1981 claim because plaintiff had no direct evidence of discrimination (citation omitted)).

The *McDonnell Douglas* framework applies a three-step analysis. *Conroy*, 707 F.3d at 1171; *Exum*, 389 F.3d at 1134–35. First, a plaintiff bears the initial burden of showing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Next, if plaintiff meets this prima facie burden, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Last, and if defendant satisfies that burden, the burden shifts back to plaintiff to show that defendant's proffered reasons for its actions are pretextual. *Id.* at 804. Defendants argue that plaintiff's Title VII & § 1981 discrimination

claims cannot survive summary judgment under the *McDonnell Douglas* test.  The Court addresses each prong of the *McDonnell Douglas* burden-shifting framework, below.

### 1.   Prima Face Case of Discrimination

The elements of a plaintiff's prima facie case may vary depending on the nature of the claim.  *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012).  But "'[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination.'"  *Id.* (quoting *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005)).  To establish a prima facie case of discrimination, a plaintiff generally must show:  "'(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination.'"  *Id.* (quoting *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004)).  A plaintiff may satisfy the third prong of the prima facie test in any number of ways "such as 'actions or remarks made by decisionmakers,' 'preferential treatment given to employees outside the protected class,' or 'more generally, upon the timing or sequence of events leading to plaintiff's termination.'"  *Id.* (quoting *Plotke*, 405 F.3d at 1101).

Here, defendants argue that plaintiff has failed to show that he was terminated under circumstances giving rise to an inference of discrimination.  Plaintiff never addresses this element in his response to defendants' summary judgment motion and he provides no evidence demonstrating that his termination occurred under circumstances giving rise to an inference of discrimination.  But, even if plaintiff could set forth sufficient evidence to support a prima facie case of discrimination under Title VII and § 1981, summary judgment is still warranted because

plaintiff has failed to present any facts that could support an inference that defendant's

legitimate, non-discriminatory reason for terminating his employment is pretextual.

### 2.   Legitimate, Non-Discrimination Reason for Termination

The second prong of the *McDonnell Douglas* test shifts the burden back to defendants to

articulate a legitimate, non-discriminatory reason for their adverse employment action.

*McDonnell Douglas*, 411 U.S. at 802.  Defendants have satisfied the burden imposed by this

prong.  As explained in Section IV.A.2 above, the undisputed evidence establishes that Tortoise

terminated plaintiff's employment because he made critical and disparaging remarks about the

company and its management and placed unreasonable demands on management before he

would agree to return to work.  This is a legitimate, non-discriminatory reason for plaintiff's

termination.  *See Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165 (10th Cir. 2007)

(affirming summary judgment and holding that defendant's proffered justification for

terminating plaintiff's employment based on his refusal to return to work unless the company's

human resources manager apologize to him was sufficient for defendant to meet its "exceedingly

light" burden to show a legitimate, non-discriminatory reason for the termination (citation and

internal quotation marks omitted)); *see also Maston v. St. John Health Sys., Inc.*, 296 Fed. App'x

630, 634 (10th Cir. 2008) (explaining that insubordination was one of two related, non-

discriminatory reasons that defendant had for firing plaintiff).  The Court thus proceeds to the

final step of the *McDonnell Douglas* burden-shifting test.

### 3.  Pretext

Having met *McDonnell Douglas'* charge requiring an employer to articulate a legitimate,

non-discriminatory reason for plaintiff's termination, the burden now shifts back to plaintiff to

show that the employer's explanation is pretext.  *McDonnell Douglas*, 411 U.S. at 804.  A

plaintiff may demonstrate pretext by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citations and internal quotation marks omitted). To survive summary judgment, plaintiff must raise a genuine issue of material fact whether the defendant's proffered reason is unworthy of belief. *Id.* at 1321–22 (citing *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)). "Evidence of pretext may take any number of forms, including evidence the plaintiff 'was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.'" *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). But "'mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis'" to deny summary judgment. *Morgan*, 108 F.3d at 1323 (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

Here, the summary judgment evidence, when viewed in the light most favorable to plaintiff, includes no admissible evidence giving rise to a genuine issue whether defendants' proffered reason for plaintiff's termination is pretextual. First, plaintiff provides no evidence that other similarly-situated employees were treated differently. He has identified no other employees who made critical and disparaging remarks about the company and its management or who placed unreasonable demands on management, but were not terminated from employment. To the contrary, the undisputed evidence shows that plaintiff received similar treatment during his employment compared to employees who are not members of a protected class. Plaintiff complained that Ms. Kelly was a demanding boss who expected him to work after hours and on

weekends.  He also complained that she engaged in demeaning behavior such as yelling at her subordinates.  But plaintiff concedes that Ms. Kelly treated other employees the same way she treated him.  Plaintiff claims that Ms. Kelly also harassed Jeremy Goff, Brian Sulley, and Lisa Rebel, who are all Caucasian and not Muslim.  Thus, the summary judgment facts fail to show that Ms. Kelly treated plaintiff differently because of his race or religion.

Plaintiff also claims that Ms. Kelly, by demanding him to work after hours and on weekends, prevented him from praying on Fridays and affected his personal life and religious obligations.  Indeed, plaintiff complained to Ms. Boissonneau in his April 20, 2012 email that his work hours and arbitrary and capricious work load were impacting his health, personal life, and religious obligations.  But the record contains no evidence to raise an inference that Ms. Kelly imposed these working conditions on plaintiff because of his race or religion.  Plaintiff's subjective beliefs about his working conditions are insufficient to establish pretext.  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir. 1997) (affirming summary judgment and holding that plaintiff failed to establish pretext because plaintiff's allegations that his supervisor discriminated against him based on his national origin was based only on his subjective belief and the summary judgment facts showed that the supervisor treated all of his employees harshly, not just plaintiff).

Plaintiff also provides no evidence of any comments made about his race or religion that suggest the reasons given for his termination are pretextual.  Indeed, the EEOC investigator who interviewed plaintiff on two separate occasions about his charge of discrimination noted that in each interview plaintiff made no complaints about racial, national origin, or religious comments. Plaintiff did complain during his meeting with Ms. Boissonneau on April 20, 2012, about a time in March 2012, when he was at the airport receiving calls and emails from Ms. Kelly.  He

claimed that the flight attendants told him several times to turn off his phone, but Ms. Kelly would not let him.  Plaintiff suggested to Ms. Boissonneau that his race subjected him to more scrutiny when boarding an airplane.  He did not accuse Ms. Kelly of making any comments about his race to Ms. Boissonneau.  Later, in his deposition, plaintiff testified that Ms. Kelly commented that his race or "Middle Eastern name" may have caused this scrutiny, but plaintiff admitted that he raised the issue about his race first.  Viewing this evidence in the light most favorable to plaintiff, Ms. Kelly's alleged comments on this one occasion—comments made after plaintiff had raised the race issue first—do not raise an inference that plaintiff's termination was pretext for discrimination based on his race or religion.

Plaintiff argues that the company provided inconsistent information to him and his counsel, as demonstrated by conflicting information in his lawyer's affidavit and Ms. Boissonneau's Activity Log.  But plaintiff's allegations mischaracterize the actual content of the evidence he cites, and the alleged inconsistencies do not establish pretext.  Plaintiff claims that his lawyer received a phone call from Mr. Lambright after the April 20, 2012 meeting in which Mr. Lambright informed his lawyer that plaintiff had performance issues and that his position was just above entry level.  Plaintiff asserts that Ms. Boissonneau later denied that Mr. Lambright accused plaintiff of having performance issues.  Plaintiff claims his job performance was excellent, shown by the amount of money he raised for the company and a bonus he received less than three months into his employment.  While plaintiff may have had some success in his position at Tortoise, Ms. Boissonneau's Activity Log documents other performance issues including plaintiff's insubordination, disparaging remarks about the company and its management, and his refusal to return to work unless he reported to a different supervisor and worked only certain hours.  Also, his lawyer's affidavit does not state that Mr. Lambright

told him that plaintiff's job was "just above entry level." Instead, his lawyer states Mr. Lambright told him that plaintiff held a position that is above entry level and there was no room to move him laterally to a new position or a more senior position. The Court finds no inconsistencies between what the company told plaintiff's lawyer and what Ms. Boissonneau documented in her Activity Log. This evidence does not establish a rational basis for a jury to conclude that his company's articulated reason for firing him is a pretext for discrimination.

Finally, the Court recognizes that the summary judgment facts support an inference that defendants' proffered reason for the termination is not pretextual because the "same actors" hired and fired plaintiff within an approximately nine-month period. The "same actor inference" is premised on the idea that it "makes little sense to deduce" that an individual would hire an employee, being fully aware of his race and national origin, and then fire that same employee a short time later based on the employee's race or national origin. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006). The Tenth Circuit held in *Antonio* that "in cases where the employee was hired and fired by the same person within a relatively short time span, there is a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Id.* (citation and internal quotation marks omitted).

Here, Ms. Kelly made the decision to hire plaintiff after consulting with and receiving input from Mr. Birzer and Mr. Matlack. Ms. Kelly, Mr. Birzer, and Mr. Matlack interviewed plaintiff before his hire, and they were aware that he was of some Asian origin, or more precisely, from somewhere on the Indian subcontinent. Plaintiff received his employment offer from Tortoise on August 22, 2011, and he began working for the company on September 12, 2011. Approximately nine months later, Mr. Birzer, in close consultation with Mr. Matlack and after conferring with Ms. Kelly, made the decision to terminate plaintiff's employment effective

May 1, 2012.  Because these same actors were involved in both decisions to hire and fire

plaintiff only nine months apart, and were aware of plaintiff's race before making the decision to

hire him, defendants are entitled to an inference that the proffered reason for plaintiff's

termination is not pretextual.  *See id.* (holding that defendants were entitled to the same actor

inference when the time between plaintiff's hire and termination was 10 months).  While

plaintiff can rebut this inference with countervailing evidence of pretext, plaintiff has presented

no evidence here to overcome the same actor inference.  *See id.* at 1183–84 (holding that

plaintiff's evidence of pretext did not dispel the "same actor inference").

      In sum, the record lacks any other evidence to establish that defendants' legitimate, non-

discriminatory reason for plaintiff's termination is unworthy of belief.  Thus, plaintiff fails to

establish pretext under the *McDonnell Douglas* test.  Defendants therefore are entitled to

summary judgment against plaintiff's Title VII and § 1981 discrimination claims.

### 4.  Unpreserved Claims

      In his response to defendants' summary judgment motion, plaintiff refers to a retaliation

claim.  Doc 135 at 13–15 (citing the elements of a prima facie case of retaliation under Title VII

and § 1981 and arguing that he has "conclusively establish[ed]" those elements).  But plaintiff

never asserted a retaliation claim under either Title VII or § 1981 as part of this case.  *See* Doc.

118 at 14–15 (Pretrial Order).

      The Pretrial Order "controls the course of the action unless the court modifies it."  Fed.

R. Civ. P. 16(d).  Thus, when a party fails to include an issue in the Pretrial Order, that issue is

not part of the case before the court.  *See Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304 (10th

Cir. 2003) (holding that defendants waived a statute of limitations defense even though

defendants pleaded it because the Pretrial Order, which supersedes the pleadings, omitted the statute of limitations defense).

Here, the Pretrial Order lists the four claims plaintiff asserts in this lawsuit—none of those four claims is a retaliation claim under Title VII or § 1981.  Doc. 118 at 14–15.  Plaintiff therefore has waived any Title VII and § 1981 retaliation claims, and the Court should ignore the references made in plaintiff's response to such claims.  *See Moral v. Hagen*, Case No. 10–2595–KHV, 2013 WL 1660484, at *6–8 (D. Kan. Apr. 17, 2013) (holding that plaintiff waived retaliation claims not asserted in Pretrial Order because the court would not "allow plaintiff to bootstrap into the pretrial order a wholly unstated theory of recovery, even if she may have asserted the claim earlier in the case"); *Smith v. Potter*, Case No. 05-2149-JWL, 2006 WL 3050814, at *3 n.1 (D. Kan. Oct. 25, 2006) (concluding that plaintiff waived discrete claims of discrimination or retaliation that did not appear in the Pretrial Order); *BioCore, Inc. v. Khosrowshahi*, 41 F. Supp. 2d 1214, 1231 (D. Kan. 1999) (holding that pro se party abandoned claims not found in the Pretrial Order).

Nevertheless, even if plaintiff properly had asserted retaliation claims, they would not survive summary judgment.  The *McDonnell Douglas* burden-shifting analysis that applies to Title VII and § 1981 discrimination claims also applies to retaliation claims.  *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (explaining that the showing required to establish retaliation is identical under Title VII and § 1981 and involves application of the *McDonnell Douglas* burden-shifting framework).  For the reasons explained in this Memorandum and Order, defendants have articulated a legitimate, non-discriminatory, and non-retaliatory reason for plaintiff's termination, and plaintiff provides no evidence to show that the reason for his discharge is pretextual.

### C.  Obstruction of Justice Claim Under 42 U.S.C. § 1985(3)

Finally, plaintiff claims that defendants interfered with plaintiff's civil rights by obstructing justice in violation of 42 U.S.C. § 1985(3).  Plaintiff asserts that when he met with Mr. Birzer and Ms. Boissonneau on April 30, 2012, they obstructed justice by threatening and forcing him to sign a release agreement that usurped his legal rights (including basic constitutionally protected and civil rights).  *See* Doc. 118 at 6 (Pretrial Order at ¶ 3a); *see also* Doc. 135 at 20–21 (arguing in plaintiff's response to defendants' summary judgment motion that defendants "deprive[d] the plaintiff of equal protection of the laws by forcing and threatening the plaintiff to sign the Release Agreement, then and there [at the April 30, 2012 meeting]. . . . The Release Agreement that defendants were forcing the plaintiff to sign, then and there, specifically mentions usurpation of Section 1981 claims.")

Defendants' summary judgment motion argues that plaintiff's claim fails for two reasons. First, defendants assert that they never deprived plaintiff of his constitutional rights because plaintiff never signed the release agreement.  Also, defendants argue that plaintiff has presented no evidence of a conspiracy other than his conclusory allegations and they are insufficient to avoid summary judgment.  The Court agrees with defendants on both points.

Section 1985(3) prohibits two or more persons from conspiring "for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).  A claim asserted under 42 U.S.C. § 1985(3) requires:  "(1) the existence of a conspiracy (2) intended to deny [plaintiff] equal protection under the laws or equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the

object of the conspiracy." *Murray v. City of Sapulpa*, 45 F.3d 1417, 1423 (10th Cir. 1995)

(citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971) (further citation omitted)).

Here, defendants argue that plaintiff cannot satisfy the third element of the claim because

plaintiff has failed to show that he was injured or deprived of his federally-protected rights when

defendants allegedly threatened him and forced him to sign the release agreement.  But the

summary judgment facts establish that during plaintiff's meeting with Mr. Birzer and Ms.

Boissonneau on April 30, 2012, Tortoise offered plaintiff a severance package that included

financial compensation in exchange for a release of claims.  After the meeting, defendants sent

plaintiff a draft agreement by email.  Plaintiff refused to sign the agreement, and instead

demanded additional severance compensation.  Tortoise rejected his demand, and plaintiff never

signed a post-employment agreement with Tortoise.  He also never released any claims against

Tortoise or its agents.  While plaintiff contends that the release agreement usurps his rights under

§ 1981, he never signed that agreement and therefore defendants never deprived him of any

rights under this federal statute.  Plaintiff provides no other evidence showing that defendants

deprived him of any other constitutional rights by allegedly forcing and threatening him to sign

the release agreement.  Thus, plaintiff's claim under 42 U.S.C. § 1985(3) fails.

Plaintiff's claim cannot survive summary judgment for another, independent reason.

Plaintiff has not presented evidence of a conspiracy to satisfy the first element of the claim.  To

show a conspiracy existed, plaintiff must come forward with admissible evidence showing a

mutual understanding or a meeting of the minds among the conspirators.  *Henry v. Bd. of

Leavenworth Cnty. Comm'rs*, 64 F. Supp. 2d 1042, 1058 (D. Kan. 1999) (citations omitted).

While plaintiff accuses the defendants of conspiring to deprive him of his constitutional rights,

he provides no evidence to support his allegations other than speculative and conclusory

musings.  They do not suffice to create a genuine issue for trial.  *Id.* at 1059 (granting summary judgment and explaining that "[p]laintiffs cannot simply make conclusory allegations that a conspiracy existed; plaintiffs must provide specific facts showing agreement and concerted action." (citing *Lemons v. Lewis*, 969 F. Supp. 657, 664 (D. Kan. 1997) (further citation omitted)).  Instead, the record here contains no evidence that defendants shared a mutual understanding or reached a meeting of the minds about threatening or forcing plaintiff to sign a release agreement at the April 30, 2012 meeting.  Without such evidence, the Court must grant summary judgment against plaintiff's claim under 42 U.S.C. § 1985(3).

**V.     Conclusion**

Viewing the evidence in the light most favorable to plaintiff, no genuine issues of material fact exist that permit any of plaintiff's four claims to survive summary judgment.  The Court thus grants defendants' motion for summary judgment as a matter of law.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the defendants' Motion for Summary Judgment (Doc. 121) is granted.

**IT IS SO ORDERED.**

**Dated this 5th day of November, 2015, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**